Alan A. D'Ambrosio  (AAD-1488)
John D. Giansello  (JG-0129)
Oswald B. Cousins (OC-0048)
ORRICK, HERRINGTON & SUTCLIFFE  LLP
666 Fifth Avenue
New York, New York  10103
Telephone:  (212) 506-5000

Attorneys for Defendant
Breda Transportation, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

PAOLO LONGO,

                     Plaintiff,

               -- against --

BREDA TRANSPORTATION, INC.,

                . Defendant.

----------------------------------------------------------x

No. 04-CV-10241 (GBD)


**DEFENDANT BREDA TRANSPORTATION, INC.'S MEMORANDUM
IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. RULE 50(b)**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   ARGUMENT ............................................................................................................ 2

    A.   The Second Circuit standard for granting JMOL under Rule 50(b) .......... 2

    B.   Longo had the burden to present triable evidence that BTI was not
        privileged to terminate his employment.  He could not do so. .................. 3

        1.   The contract was terminable at will under peremptory
             New York law .............................................................................. 4

        2.   The contract was properly terminated under its terms ................. 7

             (a)   Longo had the burden to prove BTI's dissatisfaction
                    was not genuine. ............................................................... 7

             (b)   BTI's accumulated dissatisfaction with Longo was
                    not pretextual ................................................................... 9

                 (i)    Longo's refusal to perform his assigned
                         duties ............................................................... 11

                 (ii)   Longo's failure to perform his non-delegable
                         duties ............................................................... 18

        3.   Legal cause excused further performance by BTI ...................... 22

    C.   No rational jury could find that BTI breached Longo's contract. ............ 23

III.  CONCLUSION ....................................................................................................... 24

OHS East:160174997.3

# TABLE OF AUTHORITIES

## CASES

*Alston* v. *New York City Transit Authority,*
   14 F. Supp. 2d 308 (S.D.N.Y. 1998)..................................................................2

*Arentz* v. *Morse Dry Dock & Repair Co.,*
   249 N.Y. 439, 164 N.E. 342 (1928)...................................................................4

*Cobb* v. *Pozzi,*
   363 F.3d 89 (2d Cir. 2003)..........................................................................2, 3

*Coleman* v. *Prudential Relocation,*
   975 F. Supp. 234 (W.D.N.Y. 1997)..................................................................7

*Comm. of Unsecured Creditors* v. *Investcorp Intern., Inc.,*
   1999 U.S. Dist. LEXIS 14826 (S.D.N.Y. Sept. 24, 1999).......................................10

*Dalton* v. *Union Bank of Switzerland,*
   134 A.D.2d 174, 520 N.Y.S.2d 764 (1st Dep't 1987)............................................5

*De Petris* v. *Union Settlement Assn.,*
   86 N.Y.2d 406, 633 N.Y.S.2d 274 (1995).........................................................4

*Duane Jones Co.,* v. *Burke,*
   306 N.Y. 172, 117 N.E.2d 237 (1954).............................................................10

*Foxworth* v. *American Bible Society,*
   2005 U.S. Dist. LEXIS 16105 (S.D.N.Y. Aug. 3, 2005)........................................7

*Frink America, Inc.* v. *Champion Road Machinery,*
   2002 U.S. App. LEXIS 17633 (2d Cir. 2002) ....................................................3

*Fursmidt* v. *Hotel Abbey Holding Corp.,*
   10 A.D.2d 447, 200 N.Y.S.2d 256 (1st Dep't 1960)............................................8

*Getty* v. *Roger Williams Silver Co.,*
   221 N.Y. 34, 116 N.E. 381 (1917).................................................................23

*Golden* v. *Worldvision Enters., Inc.,*
   133 A.D.2d 50, 519 N.Y.S.2d 1 (1st Dep't 1987)............................................7, 8

*Goldhirsh Group, Inc.* v. *Alpert,*
   107 F.3d 105 (2d Cir. 1997).......................................................................3, 9

*Graham* v. *Texasgulf, Inc.*,
    662 F. Supp. 1451 (D. Conn. 1987) ..............................................................................23

*Haskell* v. *Kamen Corp.*,
    743 F.2d 113 (2d Cir. 1984) ......................................................................................2

*Heyman* v. *Kline*,
    344 F. Supp. 1088 (D. Conn. 1970) ....................................................................22, 23

*Hortis* v. *Madison Golf Club, Inc.*,
    92 A.D.2d 713, 461 N.Y.S.2d 116 (4th Dep't 1983) ...............................................7

*Hunnewell* v. *Manufacturers Hanover Trust Co.*,
    628 F. Supp. 759 (S.D.N.Y. 1986) ..........................................................................6

*Jerome* v. *Queen City Cycle Co.*,
    57 N.E. 485 (N.Y. 1900) .........................................................................................22

*Kotick* v. *Desai*,
    123 A.D.2d 744, 507 N.Y.S.2d 217 (2d Dep't 1986) ..............................................6

*Kilian* v. *The Ferrous Magnetic Corp.*,
    245 A.D. 298, 280 N.Y.S. 909 (1st Dep't 1935) ....................................................23

*LaDuke* v. *Int'l Paper Co.*,
    258 A.D. 375, 17 N.Y.S.2d 608 (3d Dep't 1940) ...................................................22

*Lamdin* v. *Broadway Surface Advertising Corp.*,
    272 N.Y. 133, 5 N.E.2d 66 (1936) ..........................................................................10

*MDO Dev. Corp.* v. *Kelly*,
    735 F. Supp. 591 (S.D.N.Y. 1990) ..........................................................................23

*Mandel* v. *O'Connor*,
    2001 N.Y. Misc. LEXIS 1008 (Civ. Ct. N.Y. Co. Feb. 7, 2001) .............................6

*Martin* v. *Citibank, N.A.*,
    762 F.2d 212 ......................................................................................................3, 9, 10

*Marz* v. *Akers*,
    88 N.Y.2d 189, 644 N.Y.S.2d 121 (1996) ..............................................................10

*Mink, Inc.*, v. *Reliance Ins. Co.*,
    65 F. Supp. 2d 176 (S.D.N.Y. 1999) .......................................................................10

*Montana* v. *First Fed. Sav. & Loan Ass'n*,
869 F.2d 100 (2d Cir. 1989)..................................................................................7

*Murphy* v. *American Home Prods. Corp.*,
58 N.Y.2d 293, 461 N.Y.S.2d 232 (1983) ...........................................................5

*Natoli* v. *Carriage House Motor Inn, Inc.*,
1988 WL. 53397 (N.D.N.Y. May 24, 1988)........................................................10

*Nelson* v. *Metro-North Commuter R.R.*,
235 F.3d 101 (2d Cir. 2000)..................................................................................3

*Passy* v. *Guild Concepts, Ltd.*,
1992 U.S. Dist. LEXIS 3941 (S.D.N.Y. Apr. 2, 1992).........................................4

*Pereira* v. *Cogan*,
294 B.R. 449 (S.D.N.Y. 2003)............................................................................10

*Piesco* v. *Koch*,
12 F.3d 332 (2d Cir. 1993)....................................................................................2

*Rooney* v. *Tyson*,
91 N.Y.2d 685, 674 N.Y.S.2d 616 (1998) .....................................................4, 5, 6

*Rudman* v. *Cowles Communications, Inc.*,
35 A.D. 213, 315 N.Y.S.2d 409 (1st Dep't 1970).............................................22

*Shenk* v. *Red Sage, Inc.*,
1994 U.S. Dist. LEXIS 399 (S.D.N.Y. Jan 21, 1994)..........................................22

*Speiden* v. *Innis*,
216 A.D. 408, 215 N.Y.S. 515 (1st Dep't 1926) ................................................22

*St. Mary's Honor Center* v. *Hicks*,
509 U.S. 502 (1993)...............................................................................................9

*Weiler* v. *National Multiple Sclerosis Socy.*,
1980 WL. 104 (S.D.N.Y. 1980)............................................................................6

*William Stevens, Inc.* v. *Kings Village Corp.*,
234 A.D.2d 287, 650 N.Y.S.2d 307 (2d Dep't 1996)..........................................22

*Woodman* v. *WWOR-TV, Inc.*,
411 F.3d 69 (2d Cir. 2005).....................................................................................9

*Wright* v. *Cayan,*
    817 F.2d 999 (2d Cir. 1997)............................................................................................6

## STATUTES AND RULES

Federal Rules of Civil Procedure
    50............................................................................................................................1, 2
    50(b)..............................................................................................................................2
    56..................................................................................................................................2
    59..................................................................................................................................2

Federal Rules of Evidence
    301................................................................................................................................8

OHS East:160178497.1

## I.   **PRELIMINARY STATEMENT.**

At the close of the Plaintiff's case, Defendant <u>BREDA TRANSPORTATION,</u>

<u>INC.</u> ("BTI") moved for judgment as a matter of law against all claims of Plaintiff

<u>PAOLO LONGO</u> ("Longo") under Fed. R. Civ. P. Rule 50, on the grounds that (1) as a

matter of controlling New York law, Longo's contract was terminable at will and no

cause of action could be maintained for breach; (2) that, in the alternative, the contract

was properly terminated according to its provisions and Longo could not meet his burden

of proof to raise a triable issue to the contrary; and (3) the evidence demonstrated legal

cause excusing BTI from any obligation of further performance under the contract.  Tr.

965:19 – 967:2; 970:3-20.  The Court denied the motion.  Tr. 970:21 – 971:24.  BTI

renewed the motion on the same grounds at the close of all of the evidence, and it was

again denied.  Tr. 1600:2-24.  BTI now respectfully renews the motion after verdict.

Allowing this verdict to stand would set precedent contrary to New York law,

permitting rhetorical artifice to defeat public policy favoring employment at will.[1] It

would also invert the burden of proof applicable to a contract contingent upon

satisfactory performance, by excusing the Plaintiff from any need to present evidence

demonstrating that the employer's dissatisfaction was not genuine.  There was no such

evidence here.  Moreover, allowing the verdict to stand invades an employer's right to

require high-level managerial and executive accountability, allowing it to be defeated by

the conjecture, argument and subjective personal opinion of the employee.  This is not the

law, and it is not what Longo's contract provided either.  For these reasons, JMOL should

---

[1] The negotiation of Longo's contract went on for several years, and Longo himself contributed language to
the outcome. Tr. 488:7 – 489:9.  There was no reason Longo could not have insisted upon a contract for a
definite term of years, even a lengthy one, terminable only for cause, with cause defined as the parent
company's cessation of business in the United States.  But that is not what the parties agreed upon, and they

be granted. In a separate motion, BTI moves in the alternative for a new trial or remittitur of damages pursuant to Rule 59.[2]

## II.    ARGUMENT.

The undisputed and uncontradicted evidence establishes that there was no triable issue of material fact in this case, that the case was improperly submitted to the jury, and that the jury's verdict could only have been based upon the sheer surmise and conjecture that were the arguments of Plaintiff's counsel, rather than upon any material evidence presented at trial.

### A.    The Second Circuit standard for granting JMOL under Rule 50(b).

"The same standard that applies to a pretrial motion for summary judgment pursuant to Fed. R. Civ. P. Rule 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993). Under Rule 50(b), JMOL is warranted where (1) there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of surmise and conjecture; or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded men could not arrive at a verdict against him. *Haskell v. Kamen Corp.*, 743 F.2d 113, 120 (2d Cir. 1984); *Alston v. New York City Transit Authority*, 14 F.Supp. 2d 308, 310-11 (S.D.N.Y. 1998).

Stated another way, a JMOL should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2003). To survive JMOL, the plaintiff must

---

are bound by what they did agree upon. Manifestly, the obvious purpose of this contract was to procure Longo's services for the Company, not to keep the Company in business in order to guarantee him a job.
[2] Both motions are supported by the accompanying Declaration of John D. Giansello, dated March 7, 2007, and filed herewith, appending copies of the cited exhibits admitted at trial. Citations to the trial transcript are noted as "Tr.".

produce "*tangible proof* to demonstrate that his version of what occurred was not

imaginary." *Id.*, 363 F.3d at 108 (emphasis added). *See, e.g., Frink America, Inc. v.*

*Champion Road Machinery*, 2002 U.S. App. LEXIS 17633 (2d Cir. 2002) (affirming

JMOL overturning verdict where plaintiff in conversion claim relied on theory and

argument rather than *affirmative evidence* that defendant knowingly possessed property

he knew was plaintiff's) (emphasis added); *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105

(2d Cir. 1997) (reversing verdict and granting JMOL on tort claim where plaintiff relied

upon causation theory, insufficient circumstantial evidence, and argument that

defendant's denial not credible); *Martin v. Citibank, N.A.*, 762 F.2d 212 (2d Cir. 1985

(reversing district court's denial of post-verdict JMOL where verdict based upon

statistics, insufficient circumstantial evidence and claim that employer's denial should not

be believed). *See also Nelson v. Metro-North Commuter R.R.*, 235 F.3d 101, 104 (2d Cir.

2000) (affirming JMOL for employer in tort claim under FELA).

It is therefore the plaintiff's burden to present affirmative evidence that the events

essential to his case occurred.

**B.      Longo had the burden to present triable evidence that BTI was not**
**         privileged to terminate his employment.  He could not do so.**

The Court ruled that the only issue to be tried in this action was whether BTI

breached its employment agreement with Longo by terminating Longo's employment.

Tr. 1469:3 – 1470:4; 1476:5-9.  The Court then submitted the case to the jury on a

simple instruction that Longo had the burden to prove by a preponderance of the evidence

"(1) the existence of a duly executed and enforceable agreement; (2) performance or offer

to perform [by Longo] in accordance with the terms of the contract; (3) that [BTI] failed

to perform under or breached the agreement; and (4) that the breach caused the actual

damages sustained." Tr. 1696:1 – 1698:10.  But only the terms of the contract, not its existence, were in issue; and the evidence of performance by Longo was negligible and conjectural.[3]  The jury submission therefore turned preliminarily on whether the contract was for a fixed or definable term, and, if so, substantially upon whether Longo could prove a breach by BTI.

### 1.   The contract was terminable at will under peremptory New York law.

In New York, "'[a]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.'" *Rooney v. Tyson*, 91 N.Y.2d 685, 674 N.Y.S.2d 616, 618 (1998) (quoting *De Petris v. Union Settlement Assn.*, 86 N.Y.2d 406, 410, 633 N.Y.S.2d 274, 276 (1995)). In determining whether an agreement establishes a fixed duration, "such temporally amorphous terms" as "permanent", or "for life" are insufficient. *Rooney* at 691, 674 N.Y.S.2d at 619.  Nor do such durational expressions as "as long as the company remained in business" or that the employee would "have a job until the company is sold" establish a fixed duration.  *Arentz v. Morse Dry Dock & Repair Co.*, 249 N.Y. 439, 442-44, 164 N.E. 342, 344 (1928); *Passy v. Guild Concepts, Ltd.*, 1992 U.S. Dist. LEXIS

---

[3] There was no issue as to *formation* of the contract, only as to its durational term under New York law.  As for *performance* by Longo, the evidence was almost exclusively about the value of contracts obtained by the parent company over 20+ years prior to Fantappie's arrival. Tr. 240:5 – 244:15, Pl. Exh. 133.  There was no evidence submitted about Longo's specific role in the procurement of any of these contracts, a fact observed by Charles Sodikoff, BTI's placement expert, in reviewing Longo's resume. Tr. 1246:24 – 1248:13, Def. Exh. 79.  It was undisputed that no new contracts had been obtained by the parent company in the United States in the five years until just a few months before Fantappie arrived. Tr. 986:5-11; 1438:12 – 1439:8.  It was also undisputed that, at the time of Fantappie's arrival, the existing contracts in Atlanta and Boston were in trouble and together were losing money for the parent company. Tr. 986:12-18; 1420:11 – 1421:8.  There was, moreover, no evidence of Longo's role in procuring the Los Angeles contract in June 2003; the evidence was that BTI was the low bidder on that contract, and that, if it was "sold" by anyone in the United States at all, it was "sold" by Lucia DiMeglio. Tr. 935:14-17; 1439:3-8.  All of this, in any event, occurred prior to the events perpetrated by Longo once Fantappie arrived or was wholly irrelevant to Longo's abdication of financial oversight over BTI.  The only other evidence of satisfactory performance was the marketing research materials Longo's people prepared for Fantappie, with which Fantappie pronounced himself satisfied. Tr. 306:16 – 308:5; 1426:23 – 1427:1; 1529:6-21.  There

3941, *8 (S.D.N.Y. Apr. 2, 1992).  These and other "unenforceable porous phrasings" are not "delimited by legally and realistically cognizable boundaries," sufficient to imply a fixed term.  *Rooney* at 691, 674 N.Y.S.2d at 619.

The consequence is that, where the agreement is thus not for a fixed duration, "the law accords the employer an unfettered right to terminate the employment at any time." *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 237 (1983).  In such a case, no action may be maintained for breach of contract when the employment is terminated.  *Dalton v. Union Bank of Switzerland*, 134 A.D.2d 174, 176, 520 N.Y.S.2d 764, 766 (1st Dep't 1987).

Longo's employment agreement with BTI expressly stated that his contract was "for an indefinite term."  Pl. Tr. Exh. 106, p. 2.  At trial, the evidence confirmed the utter indefiniteness of the term of this agreement.  Longo testified it was to last "for indeed as long as Paolo Longo was able to assure his support."  Tr. 154:1-2.  And he continued, "[s]o as long as the company did business in the United States, Longo would be there." Tr. 154:3-5.  Longo testified further that he was entitled under the agreement to be employed "as long as I am able to assist the parent company in selling products in the United States."  Tr. 490:3-6.  He had previously testified at deposition that the agreement entitled him to work for BTI for the remainder of his productive life and "maybe even beyond."  Tr. 492:6 – 493:10.  There was, in addition, testimony from Lucia DiMeglio that the delivery and acceptance process for vehicles sold by the parent company was lengthy and "could take years," that a contract obtained in Los Angeles in 2003 did not contemplate beginning deliveries until 2009, and that her perception was that Giancarlo

---

was, however, much more to marketing than this, and for that, Longo's secretive activities provided more than grounds for legitimate dissatisfaction.  Tr. 1427:3 – 1428:4; 1430:9 – 1431:4.

Fantappie had been brought into the Company "to keep the U.S. market going." Tr. 926:20 – 930:4.

Thus, whether looking to the plain language of the agreement (expressly "indefinite") or Longo's interpretation of it ("as long as Longo was able to assure his support" and for "the remainder of his productive life"), or the future prospects of the business in the United States ("could take years"), the term of employment under the contract was indefinite under New York law. *Rooney* at 691, 674 N.Y.S.2d at 619; *Kotick v. Desai*, 123 A.D.2d 744, 744, 507 N.Y.S.2d 217, 218 (2d Dep't 1986); *Wright v. Cayan*, 817 F.2d 999, 1003 (2d Cir. 1997) (promise of a "permanent appointment" is employment of indefinite duration); *Hunnewell v. Manufacturers Hanover Trust Co.*, 628 F. Supp. 759, 762 (S.D.N.Y. 1986) (the phrases "full working life" and "through normal retirement age" do not state a definite term); *Weiler v. National Multiple Sclerosis Socy.*, 1980 WL 104 (S.D.N.Y. 1980) (the phrase "until he chose to retire" is indicative of the indefinite time period of the contract"). Against this firmly settled New York law, the rhetorical gymnastics of Longo's contract are ineffective to defeat the at-will nature of his employment.[4] As a matter of New York law, therefore, there was no issue here to submit to a jury.

---

[4] The "twelfth month" clause attached to the express declaration that the term is indefinite cannot diminish or qualify the latter, because the end of deliveries, etc., is not "inevitable" under New York law. *See Mandel v. O'Connor*, 2001 N.Y. Misc. LEXIS 1008, **8-10 (Civ. Ct. N.Y. Co. Feb. 7, 2001) (holding that time frame was not definite or capable of being determined where it was "dependent on market forces and the existence of willing buyers and investors which may never materialize"). Nor is this a case like *Rooney*, where it was inevitable that Tyson at some point would indeed cease to fight professionally, and where Rooney had offered independent consideration for the agreement, having taken on his assignment without compensation on the gamble that he could create with Tyson a successful prize-fighting career. Longo's contract was simply an agreement for periodic compensation for services as they were rendered. As Plaintiff's counsel has repeated to the point of tedium, in that respect the contract was fully performed by BTI. Furthermore, the duration clause being indefinite and indeterminable, the termination clauses of paragraph 5 at most simply make the agreement terminable on six months' notice.

6

2.      **The contract was properly terminated under its terms.**

(a)      **Longo had the burden to prove BTI's dissatisfaction was not genuine.**

Allowing this claim to go to the jury violated the long-settled principle of

employer-employee relations in the Second Circuit that the courts are not intended to be a

"roving commission to review business judgments." *Foxworth v. American Bible*

*Society*, 2005 U.S. Dist. LEXIS 16105, ** 22-23 (S.D.N.Y. Aug. 3, 2005) (citing

*Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1989). The courts,

therefore, must refrain from intruding into an employer's policy apparatus or second-

guessing a business's decisionmaking process." *Id.* (citing cases); *Coleman v. Prudential*

*Relocation*, 975 F. Supp. 234, 239-40 (W.D.N.Y. 1997) (same).

This strong deference to employer judgment in the absence of evidence of

invidious conduct is paralleled in the New York cases addressing termination for

unsatisfactory performance. "[T]he issue of whether services performed under the

contract were satisfactory generally is left to the *sole* judgment of the employer." *Hortis*

*v. Madison Golf Club, Inc.*, 92 A.D.2d 713, 713, 461 N.Y.S.2d 116, 117 (4th Dep't 1983)

(emphasis added). "*The burden is upon the employee asserting a breach of the*

*employment contract to show that his termination was for a reason other than*

*dissatisfaction* [citation to Williston on Contracts omitted] *or that the employer's claim of*

*dissatisfaction was feigned and not genuine.*" *Id.* (emphasis added). In such cases, "it is

the employer's prerogative to determine whether the employee is, in fact, living up to the

terms of his or her employment." *Golden v. Worldvision Enters., Inc.*, 133 A.D.2d 50,

51, 519 N.Y.S.2d 1, 2 (1st Dep't 1987). "In most situations, the employer need not have

an objective basis for his dissatisfaction with an employee; the only requirement, and

7

indeed the only relevant point of inquiry by a court, is whether the employer's dissatisfaction was *genuine*." *Id., Fursmidt v. Hotel Abbey Holding Corp.*, 10 A.D.2d 447, 449, 200 N.Y.S.2d 256, 258-59 (1st Dep't 1960) (emphasis added).

Indeed, given that Longo was the second-in-command of the corporation, and that what was at issue was his reporting relationship to the President of the Company and its Board, an even higher standard of deference applies to the judgment of BTI here:

> This is particularly the case where the job performance of high level managers is concerned. As has been commented, "Efficient running of an enterprise demands a high degree of trust and cooperation among top personnel; thus upper echelon employees should perhaps have to overcome a higher hurdle to show that their discharge was abusive or retaliatory." [Citation omitted]

*Golden* at 51, 519 N.Y.S.2d at 2. The employer, therefore, "need only produce evidence showing some basis for dissatisfaction with the employee's work." *Id.*

Under this clear standard of deference to the employer, under which the employee must produce *evidence* that the employer's reason was "feigned and not genuine," the claim here fails utterly. The contractual termination provisions allowed termination if "Mr. Longo unreasonably refuses to perform his assigned duties, or he unjustifiably performs such duties unsatisfactorily." Pl. Exh. 106, p. 3. It is, clearly under the applicable law, the employer's bona-fide satisfaction that governs; not the employee's or a jury's second-guessing of the employer.

Moreover, Rule 301 of the Federal Rules of Evidence clearly requires that a burden upon the defendant of going forward with evidence to rebut the Plaintiff's claim "does not shift to the defendant the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Therefore, the burden here was not on BTI to demonstrate that Longo

8

unreasonably refused or unjustifiably failed to perform his duties. That burden was always and ultimately on Longo. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Hence, the issue here was not whether Longo's conduct was unreasonable or unjustifiable *vel non*, but, as the New York cases recognize, whether the Plaintiff could prove that the reasons given by the employer were "feigned and not genuine."[5]

**(b)** __BTI's accumulated dissatisfaction with Longo was not pretextual.__

The reasons articulated by BTI for Longo's termination were expressed in summary form in the November 8, 2004 termination letter. Pl. Exh. 107. These articulated reasons were that, among other things, Longo had "resisted making any changes to accommodate the expanded role of BTI," that he had "been discourteous and rude with me and others," that he had "shown questionable judgment in connection with expense submissions and other business issues," and that he had "in general hindered efforts to bring about change in the operations of BTI." *Id.* These are undoubtedly legitimate business reasons for dissatisfaction with performance if genuinely held. See, e.g., Tr. 1472:1-5. There was a superabundance of evidence presented at the trial to support these grounds in fact, and to demonstrate that they were genuinely held. There was simply no evidence whatsoever that they were feigned or a pretext. Plaintiff's evidence, in fact, was all speculation, contention and cavil. Such a presentation does not meet the Plaintiff's burden.[6]

---

[5] Plaintiff has repeatedly recognized that the material issue for him to prove here is pretext. Tr. 4:21-23; 289:17-18.

[6] It is not sufficient to defeat JMOL merely to attempt to undermine the credibility of the defendant's witnesses. It is well-settled that "if all the witnesses deny an event essential to the plaintiff's case occurred, the plaintiff cannot get to the jury simply because the jury might disbelieve these denials." *Goldhirsh Group, supra*, 107 F.3d at 109 (post-verdict JMOL to defendant in interference with contractual relations claim where alleged communication to third party that plaintiff was a crook was denied by defendant and not supported by affirmative evidence by plaintiff); *Martin, supra*, 762 F.2d at 217-18. *See also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 86 (2d Cir. 2005) (citing *Goldhirsh* and *Martin* and holding that plaintiff

Plaintiff's counsel repeatedly argued to the jury that the duties for which Plaintiff was discharged were never "assigned" to him. There was no support in the evidence for this contention.[7] Two fundamental, uncontradicted facts refute this contention and make BTI's grounds for dissatisfaction patently rational. First, whatever confusion there might have been in the past over Longo's assignment[8] was unambiguously dispelled by the

---

cannot rely on efforts to discredit defendant's undisputed testimony to avoid judgment as a matter of law). Simply casting doubt on the defendant's denial of causation is insufficient to survive judgment as a matter of law – the plaintiff must proffer affirmative evidence supporting his own theory of causation. *Mink, Inc., v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 180 (S.D.N.Y. 1999), *aff'd*, 2000 WL 33223395 (2d Cir. 2000). There is no law that holds that a court must discredit undisputed testimony. In making credibility assessments against the moving party, a court is favoring the credibility of contrary evidence submitted by the non-moving party. However, where evidence is submitted by the moving party that is not and cannot be disputed with *evidence*, a court is not required to accept a non-moving party's non-evidentiary speculation and argument about the undisputed evidence. *Martin* and its progeny expressly hold otherwise.

[7] Plaintiff repeatedly attempted to mislead the jury into a specious distinction between his actions in his capacity as a member of the Board of Directors of BTI, and his actions in his role as Managing Director. See Tr. 105:1-22, 285:25 – 286:6. There was no basis for this. In both capacities, Longo was a fiduciary. *Duane Jones Co., v. Burke*, 306 N.Y. 172, 187-88, 117 N.E.2d 237, 245 (1954); *Lamdin v. Broadway Surface Advertising Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936). Where Longo had a self interest in any particular corporate transaction, he had the burden to demonstrate that it was fair and served the best interests of the corporation. *Natoli v. Carriage House Motor Inn, Inc.*, 1988 WL 53397, at *7 (N.D.N.Y. May 24, 1988). Longo was not a disinterested director here. *See Marz v. Akers*, 88 N.Y.2d 189, 202, 644 N.Y.S.2d 121, 129 (1996) ("Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally"). His actions as a member of the Board inherently affected his privileges as an employee, and vice versa. *See id.* This was unavoidable, and his duty as a fiduciary was to attempt to exercise the two responsibilities in harmony. Notwithstanding that obligation, Longo took the rigid, adamant and wholly specious view at trial that his obligation as a member of the board was simply and only "to express his opinion to the best of his ability; that's all." Tr. 442:9 – 444:23; 458:4 – 462:8; 714:5-18. When asked whether the wishes of the owners of BTI were irrelevant to the exercise of discretion by Longo, his steadfast reply was that his duty was only to express his opinion. Tr. 460:23 – 461:11. This view is simply contrary to governing law. *See Comm. of Unsecured Creditors v. Investcorp Intern., Inc.*, 1999 U.S. Dist. LEXIS 14826, *13 (S.D.N.Y. Sept. 24, 1999) ("the courts determine whether a conflict of interest of board members has deprived *stockholders* of a "neutral decision-making body") (emphasis added); *Pereira v. Cogan*, 294 B.R. 449, 527-538 (S.D.N.Y. 2003), *rev'd on other grounds sub nom Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005) ("the duty of loyalty mandates that the best interest of the corporation *and its shareholders* takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally") (citation omitted; emphasis added). There was only one shareholder here, and it was not Longo. Tr. 444:14-20. It would have been one thing for Longo to abstain from Board proposals desired by the shareholder because he had a conflict of interest – which he indubitably did – but it was quite another to abstain because the proposed measures before the Board were in conflict with his perception of his privileges under his individual employment contract, which is what he did both with respect to the October 23 Board decisions and the operational rules and organizational procedures. Tr. 484:2 – 485:25; 487:5 – 488:2; 1391:21 – 1392:10; 1399:5 – 1400:3.

[8] The evidence from the past was, in any event, not supportive of the contention that Longo's contract was inconsistent with responsibility for administration, finance and the industrial sites. Longo had had all of these responsibilities in the past under same contract, without any evidence that the assignment of them was in breach of it. Tr. 584:7 – 586:2; 587:15 – 588:22. Indeed, Longo's witness, Angelo Iunco, suggested that

action of the Board of Directors on October 23, 2003, adopting a new plan of

organization and providing Longo with a job description.  Second, certain fiduciary

responsibilities were inherent in Longo's position as senior resident officer and executive

of an American corporation headquartered in the United States, which could not be

avoided or delegated away regardless of anything someone in Italy may have told him.[9]

      (i)      **Longo's refusal to perform his assigned duties.**

As for the new plan of organization, the parties *stipulated* that it "specifically

defined the *new duties* of Longo's position under the heading vice-president/managing

director." Tr. 1597:15 – 1598:10, Def. Exh. 160 (emphasis added); see Tr. 250:17-19.

That plan of organization set forth an organization chart showing a new president

reporting to a board of directors, with Longo as vice-president and managing director

reporting to the president and being responsible for all of the other functions of the

corporate organization, including administration and finance and the industrial sites.  Tr.

453:22 – 455:10, Def. Exh. 31, p. BTI 027.  The plan gave the new, resident president

plenary authority over the organization, subject to the direction of the Board, and it

defined the duties of the vice president/managing director unambiguously as follows:

> The Vice President/Managing Director is the second most senior executive
> of BTI and reports directly to the President. *Together with the President,*
> the Vice President/Managing Director is responsible for implementing the
> major strategy and business decisions of BTI, for managing relationships
> with clients and vendors, and for acting as the liaison with AnsaldoBreda.
> He is also responsible for overseeing the *financial,* marketing, human

---

Longo was removed from responsibility for the industrial sites because he had demonstrated incompetence
in the industrial assignment he had held.  Tr. 408:13-25; Pl. Exh. 144 ("Mr. Longo did not have, as far as I
can remember, an operational competence on the WMATA job").
[9] See Tr. 405:3-6, Def. Exh. 150, p. 5 (accrual based accounting mandatory in the U.S.); 406:13-25; Def.
Exh. 150, p. 8 ("powers for ordinary management, which cannot be delegated"); 437:23 – 438:24; 438:25 –
439:12; 806:15 – 807:1 (IRS guidelines require contemporaneous statement of business purpose for
expense reimbursements); 1298:18-20 (BTI subject to U.S. accounting principles); 1344:2-12 (U.S.
corporation obligated to do accrual based accounting); 1367:24 – 1368:16 (company financial statement is
the responsibility of management, not outside auditors).

resources and *site management* functions of BTI; as such, the Chief
Financial Officer, the Human Resources Department, the Marketing
Department, *and the office of Site Management* all report to the Vice
President/Managing Director.

Tr. 455:22 – 457:21, Def. Exh. 31, pp. BTI 027-028 (emphasis added).  It is an

unavoidable inference from this that Longo was duty bound to cooperate with Fantappie

in running the Company, and to attempt to get along with him, and Longo himself all but

admitted that Fantappie thus became his boss.  Tr. 456:7 – 457:21.

 Longo was unable, then or now, to specify any respect in which this new direction

by the Board was in conflict with anything in his contract of employment.  Tr. 483:23 –

488:2; 501:3 – 503:18; 1388:23 – 1390:5; 1391:21 – 1392:23.  His objections stated as

reasons he could not consent to the plan of organization (Def. Exh. 31, BTI 024-025)

were, therefore, arbitrary, without any rational basis and groundless, and there was no

evidence they were in the best interest of BTI.[10]

 In the wake of this clearly privileged and unambiguous direction of the Board,

Longo's conduct was defiant and uncooperative.  First, he set the stage for what was to

come by overt demonstration of hostility to the new President's arrival in resisting

Pappaianni's instruction to prepare an office for Fantappie.  Tr. 1029:11 – 1030:2.  This

was followed by Longo's extraordinary rejection of Fantappie's initial exhortation that

they work together in the words:  "I don't like a president to be here; it's nothing personal,

but I don't like a president to be here;" that "it was the first time in 23 years that the

---

[10] The contention that the enjoined reformation of the demonstrably incompetent Gianfranco DiMeglio's
duties was an obstacle to the new plan of organization is obviously frivolous and adventitious.  See Tr.
250:17 – 251:8.  Whatever the peremptory effect of DiMeglio's assignment of duties, his contract of
employment was year-to-year, and BTI was privileged to terminate it for any reason or no reason on six-
month's notice.  See Tr. 824:8 – 825:3, Def. Exh. 5, ¶ 2.

president of BTI would reside in America and stay in the office of New York." Tr.

1389:11-21. All of this testimony was uncontradicted.

Second, Longo refused to accept or implement the new plan of organization

adopted by the Board on October 23, 2003. His opinionated, obdurate, backward-facing

position is revealed by his response to specific direction given to him by Fantappie in

June 2004:

> Are you joking? Several times, I have clearly shone the lights for you on the
> BTI/AnsaldoBreda organizational fiction but let me say it again: as I have always
> told you and as is cast on stone *in the faxes sent by me* in the past to Italy and
> never contested, neither in words nor in written documents, nor by facts, the
> decisions regarding DiMeglio are made by our shareholder by whom, *as far as I
> am concerned,* he has been employed for almost a decade. If you feel the need for
> further clarification, I am convinced that you can get much clarification from
> Naples and Pistoia, if they feel like giving it to you.

Pl. Exh. 81, p. BTI 000941. He then went on to complain about Acquaviva, whose

appointment as Treasurer he himself had voted for, and who, it was undisputed, reported

to the Board. *Id.*; Tr. 525:4-11; 1299:18-19; Def. Exh. 36. To this, Fantappie fairly

responded: "Personally, I think, if you want to find a way to implement the

organizational structure which, a few months ago, from the organizational point of view,

you didn't agree with, note that I am the happiest of all... Indeed, if you give me an idea

before the Board meeting, I would be delighted." Def. Exh. 56. There was no evidence

Longo ever did so.[11]

Third, Longo flat-out refused to take any responsibility, as the Board had directed,

for BTI's industrial sites. Tr. 584:7-13. Yet, he acknowledged without qualification that

---

[11]   Longo complained about Acquaviva, but it was uncontradicted that Acquaviva had direct reporting
obligations as Treasurer to the Board of Directors and to the Chairman of the Board, that Acquaviva went
to Longo on March 8, 2004, to attempt to develop a working relationship with him, and Longo told him not
to bother, that he did not need to talk to Longo. Tr. 1314:2 – 1316:19. Plaintiff's counsel attempted to
make a fuss in closing argument about the time it took for Acquaviva to talk to Longo, but Acquaviva had

the October 23 decision of the Board was to require that the site managers report to him. Tr. 587:8-14. It was undisputed that the industrial sites accounted for 90% of the costs of the Company, and 95% of its employees. Tr. 1420:11-19. At the time, both ongoing sites, Atlanta and Boston, were in crisis. Tr. 1420:22 – 1426:12. Longo flatly refused to participate with Fantappie in efforts to resolve these problems. Tr. 1420:22 – 1422:13. Fantappie thereupon took it upon himself (with no impediment from supposed control of industrial affairs by Italy) to change the management in Atlanta, and he eventually hired competent engineers to resolve the Boston problems – all steps Longo could have taken but, for inexplicable reasons in light of the clear direction of the Board, did not. Tr.1422:14 – 1425:25; 1426:1-12. In fact, when Fantappie attempted to find out from Longo what could be done in Boston, Longo told him that it was inappropriate for him to get involved and deflected him from contacts with the people in Boston who could have made a difference. Tr. 1424:21 – 1425:25.[12] All of this was uncontradicted.

Fourth, Longo confronted Fantappie almost from the beginning with threats of litigation if his claimed privileges were in any way infringed. Tr. 1419:9-24. This testimony by Fantappie was uncontradicted. Tr. 1492:16 – 1493:11. The threats became express and written on August 5, 2004, when Longo reacted in anger to Fantappie's request for explanation of certain business expenses, objecting with vehemence to

only been elected Treasurer on February 24, and his meeting with Longo was less than two weeks later. Tr. 1659:12-24; Def. Exh. 36.

[12] The conclusory testimony of Lucia DiMeglio was that Longo saved the Boston project by taking a hard-line position and asserting a claim against the Boston authority. Tr. 939:2 – 940:18. There was no evidence to indicate that Ms. DiMeglio had any personal knowledge about the predicates for this "hard-line." In fact, Pappaianni testified without contradiction that Longo had presented an extravagant and completely imprudent settlement proposal for the Boston debacle that he had rejected as such, and that he directed the initiation of the counter-claim. Tr. 1026:18 – 1027:20. Moreover, there was no dispute that the fundamental problems in Boston were engineering problems, that Fantappie set in motion the means to solve them, and that Longo had done nothing but tolerate a burgeoning legal dispute. Tr. 1421:2-24; 1422:24 – 1425:25.

Fantappie's management initiatives on the basis of his personal opinion about how the organization should be run and accusing Fantappie of "interfering with [his] contractual responsibilities." Tr. 676:2 – 677:1, Pl. Exh. 134, pp. 3-5; 1418:6-15. The threats continued in Longo's letter of September 7, 2004, where he accused Fantappie of constructively terminating his employment and presumed to know better than Fantappie what the latter's assignment was.[13] Tr. 682:7 – 683:9, Pl. Exh. 139, pp. 1-2. These threats culminated in a final meeting with Fantappie, where Longo delivered an ultimatum about convincing "someone else" that he had been "wronged" if BTI would not identify the wrongs it had committed and negotiate correction of them and repair of the "damages". Tr. 690:11 – 691:19, Pl. Exh. 140. At trial, Longo was unable to identify what he meant by this, except to say that it did not mean restoring the status quo ante. Tr. 691:20 – 692:6. The uncontradicted testimony from Fantappie was also that, during this meeting, Longo told him he had retained attorney Green as his advocate. Tr. 1439:21 – 1441:2   At that point, it was clear to Fantappie that Longo had repudiated any effort to maintain a cooperative relationship with his boss or with the Company. Tr. 1441:6 – 1442:2.

---

[13] This accusation was a fatuous attempt to explain away insubordination. Longo purports that, in September 2003, he and Cutuli "discussed" (not that Cutuli decided) farming out the unwelcome Fantappie to the industrial sites. Pl. Exh. 139, pp. 1-2. Earlier, Longo testified that, at this meeting between him and Cutuli, "it was suggested" (he does not say by whom or what the disposition was) that Fantappie could be consigned to responsibility for the industrial sites that Longo resisted. Tr. 244:16 – 245:11. But Longo was not present at any meetings between Cutuli and Fantappie. Tr. 684:7-9. Moreover, Longo's purported conversation was *before* the meeting and decision of the BTI Board of October 23, 2003, which clearly trumped it; it was *before* Fantappie's conversations with Cutuli in October 2003, which Longo has no personal knowledge about, and it was *before* Fantappie's extended post-October 23 conferences in Italy, which Longo knows nothing about. Tr. 523:10-23; 1027:21 – 1028:14; 1378:11-23. Furthermore, Longo's claim is thoroughly repudiated by Cutuli himself, who, upon receiving Longo's August 5 and 9, 2004 protestations, responded unambiguously: "[P]lease understand that Mr. Fantappie has my full support as he attempts to bring greater operational efficiency and productivity to BTI. I urge you to work cooperatively with him toward that shared goal." Tr. 681:1-11, Def. Exh. 66.

Fifth, it was uncontradicted that, from October 23, 2003, Fantappie became the person ultimately responsible for the success or failure of the Company. Tr. 1384:2-17. Longo admitted that he did not have exclusive rights to conduct marketing activities, and that Fantappie was not precluded from conducting marketing activities himself. Tr. 608:10-17; 1593:14 – 1594:2. Clearly, under the new plan of organization, Longo had to work together with Fantappie to enhance the Company's marketing efforts. Nevertheless, Longo persisted in conducting clandestine marketing activities and repeatedly attempted to exclude Fantappie from them.[14] In June 2004, Fantappie made a specific request to Longo to arrange a preparatory meeting for him with principals of the client in Los Angeles, in advance of an anticipated later meeting between the Los Angeles people and Cutuli, which Longo deliberately disobeyed, doing exactly the opposite of Fantappie's request and defeating his purpose. Tr. 620:16 – 623:1, Pl. Exh. 81; 628:1-6; 1431:23 – 1433:24. In general, Longo responded only evasively and without any information to Fantappie's requests about his marketing activities, from which Fantappie concluded that Longo was attempting to exclude him. Tr. 1427:2 – 1428:4. All of this was uncontradicted. Finally, in his intemperate response to the request to explain his expenses, Longo flatly accused Fantappie of "interfering" with his contractual responsibilities by "undertaking marketing activities on your own, both

---

[14] In April 2004, Longo complained that Fantappie should leave to him management of activities inside the marketing area when Fantappie had simply responded to a request for a conference from marketing people in Italy that came directly to him. Tr. 602:16 – 606:21, Def. Exh. 46. Again, on June 14, Longo complained that Fantappie was communicating directly with marketing people in Italy, when it turned out that Fantappie was simply responding to a direct request to him from Pappaianni. Tr. 609:2 – 616:12, Def. Exh. 51; 1428:5 – 1429:12.

directly for the American market and by directly interfacing with the parent company."
Tr. 675:7 – 676:1; 1418:21 – 1419:1, Pl. Exh. 134, p. 4.[15]

Sixth, Longo refused, arbitrarily and without any rational basis, to give his assent
to the organizational rules and operational procedures sought by Fantappie.  Longo
initially expressed his basis for opposition vaguely as "preexisting conditions."  Tr.
532:24 – 533:25, Def. Exh. 36, p. 4.  But he was unable to identify anything he had in
mind as "pre-existing conditions" other than his personal opinion about the way the
Company had operated for 20 years.  Tr. 534:8 – 535:17.  In his proposed revisions to the
rules and procedures, Longo, disregarding the instructions of the Board to provide
specific reasons, offered only his personal opinion, vaguely referring to the "existing
company organization and employment contracts," neither of which he had mentioned
when the matter came up before the Board on February 24.  Tr. 537:15 – 538:3, Pl. Exh.
141; 553:2-22; 555:19 – 556:8.  His revisions reflected only his opinion of  "what I
believe would be a more effective way to run BTI's operations."  Tr. 557:16 – 558:4, Def.
Exh. 41.  He could not identify any way in which Fantappie's proposals inhibited him
from properly fulfilling his responsibilities.  Tr. 558:5 – 559:13.  Eventually, Longo told
Fantappie that the proposed rules and procedures were in conflict with his own
employment agreement, but he was never able to identify anything specific in the rules
and procedures or his contract that was in conflict with anything else.  Tr. 1398:19 –

---

[15]  An extraordinary contention, considering that the plan of organization adopted by the Board made
Fantappie the chief executive of the Company, with Longo reporting to him.  Def. Exh. 31, pp. BTI-027-
028.  Longo's contract clearly gave him responsibility for the development of marketing activities in the
United States.  Pl. Exh. 106, p. 1.  But he seems to be unable to comprehend that it did not give him a title
deed to the field of marketing, or that he and others were part of an organization with reporting
relationships and collaboration imperatives, including those appropriate among related organizations.  His
view seemed to be that he had sole discretion over his area, with an obligation to consult superiors only if
he believed it appropriate.  See Tr. 546:14-22.  Notwithstanding, Longo was relentlessly unable to identify

1400:10; 1579:9-14. Fantappie quite rationally took Longo's revisions as an attempt to carve out his marketing sector as a personal kingdom without oversight.[16] Tr. 1401:2-18, Pl. Exh. 141; see 540:7 – 550:14. There was, therefore, never any rational basis expressed by Longo for his position on the rules and procedures, even though Fantappie revised them to afford Longo as much autonomy as he could. Tr. 1405:5-16. The only evidence is that Longo was motivated solely by his personal opinion and self-interest.

Seventh, once the rules and procedures were adopted by the Board, Longo failed or refused to implement them. Tr. 1406:15-24. This was uncontradicted.

Eighth, when called upon to be accountable as a manager, Longo erupted in nasty and groundless accusation against Fantappie. The letters speak for themselves. Pl. Exhs. 81 (BTI 940-41), 134, 136, 139. They are replete with personal attack, repudiation of duty, and ad hominem speculation. Pl. Exh. 81, BTI 920 ("I never had anything to do with it"); Pl. Exh. 81, BTI 921 ("Are you joking?" "[A]s is cast in stone in the faxes sent by me in the past;" "who does Acquaviva work for"); Pl. Exh. 134, BTI 4943 ("it was not my cooperation and my opinion that were sought but my silent submission," and repetitive reference to his opinion and edict); Pl. Exh. 136, BTI 381 (Finmeccanica sent Acquaviva to conduct a witch hunt against me); Pl. Exh. 139, BTI 210-11 (lecturing

---

anything specific about Fantappie's management proposals that inhibited him from "properly fulfilling his management responsibilities." Tr. 558:5 – 559:13.

[16] Longo at trial contended that he was not empire-building because his proposals were subject to his paragraph 3, which would provide that "The Managing Director shall duly report to the President while fulfilling his employment obligations to the Company." Tr. 539:10 – 540:12, Pl Exh. 141, p. 2. The paragraph is headed by Longo "Organizational Rules applicable to the Managing Director," and, as such, the following language upon which he relies simply evades the issue of whether the rules and procedures apply to him *at all*! *Id.* In context, all he provided for is that he would "duly" report to Fantappie, subject to his "employment obligations" as he would define them, without acknowledging the application of the rules and procedures to him. *Id.* Additionally, at trial Longo came up for the first time with the contention that his opposition to the rules and procedures was based upon the reference in them to him as "vice president" and not as "managing director." Tr. 565:12 – 570:18. It was uncontradicted that Longo never raised this objection at the time. Tr. 1403:2-12. It was also uncontradicted that he never told Fantappie he

Fantappie on why he was hired and disclaimer of responsibility for the industrial sites).
These documents were insubordination per se.

    **(ii)**    <u>**Longo's failure to perform his non-delegable duties.**</u>

        There were serious, long-standing deficiencies in BTI's financial administration
that Longo allowed to go uncorrected for years.  BTI was an American corporation
subject to American law and accounting standards.  Tr. 1116:2-13; 1129:8-12; 1194:15 –
1196:6; 1207:7 – 1208:18; 1298:18-20; 1306:6-11; 1367:16 -19.   Longo for years had
been its senior, resident executive and officer.  Tr. 437:6 – 439:12.  Whatever anyone in
Italy may have told him at any time about his financial responsibilities for an American
corporation, therefore, was irrelevant.  And, rather than attempt to solve problems of
financial control, Longo actively misrepresented his own knowledge of the Company's
financial condition to its American outside auditors.  He claimed that the administrative
and financial functions of BTI had not reported to him since sometime in the mid-1990s.
Tr. 587:15 – 588:2.  Nevertheless, he had repeatedly signed BTI's audit representation
letters to its American outside auditors, certifying he was responsible for the accuracy of
BTI's financial statements, results of operations and cash flows in conformity with
American accounting standards.  Tr. 588:17 – 596:4, Def. Exhs. 94, 95, 96.  These
certifications were, according to Longo, false.  Tr. 596:2-8; 811:6-12.  There was
uncontradicted expert testimony that this practice was inappropriate under American
accounting standards.  Tr. 1122:14 – 1124:11.  Moreover, it was undisputed that, because
of DiMeglio's incompetence, BTI had been farming out the construction of its annual
financial statements to its outside auditors, who were then reviewing and approving their

---

would support the revised rules and procedures if Fantappie were to bring them up for a Board vote.  Tr.
726:13-19.

own work, ignoring American accounting requirements and creating an inevitable conflict of interest. Tr. 808:6-9; 1013:20 – 1014:7; 1050:1-25; 1304:24 – 1306:4; 1367:20 – 1368:16. Fundamental to this problem was DiMeglio's failure or inability to do accrual accounting, which was mandatory under American standards. Tr. 405:3-6; 1305:6-11; 1344:2-12. Many of these problems had been identified and foreshadowed in the review done earlier by Iunco. Tr. 402:16 – 404:9; 404:10 – 405:6; 407:1-25; Def. Exh. 150. Longo had done nothing to attempt to solve them, which was contrary to the wishes of the owners, who expected that Longo, as a manager, would attempt to find solutions to problems. Tr. 1016:1-19.

Second, there was the problem of Longo's business expenses. It was uncontested that these expense reimbursements, amounting to hundreds of thousands of dollars, which blatantly involved self-dealing by a fiduciary, were not subject to review by anyone else before they were paid – and that Longo knew that and did not care about it. Tr. 530:25 – 532:8; 651:1-10; 811:17-23; 815:24 – 816:3.   It was also uncontested that Longo never submitted any *contemporaneous* business justification for any of his reimbursement claims, the failure to do which was a violation of applicable regulation. Tr. 654:16 – 655:2; 1116:7-13; 1195:8 – 1196:6. Indeed, Longo brazenly claimed to Fantappie that he had carte blanche responsibility for approving his own business expenses. Tr. 674:8 – 675:6, Pl. Exh. 134.

It was uncontradicted that these practices did not comply with procedures applicable to anyone else at BTI, with acceptable American accounting practice, or with applicable American regulation. Tr. 1114:13 – 1116:23; 1118:16-22; 1119:16 – 1122:13; 1129:3-19. It was admitted, in fact, that there was a Company policy concerning

20

business expenses, and that Longo did not comply with it, which itself violated the
accounting control environment requirement that the tone of integrity be set from the top.
Tr. 649:22 – 651:10; 1119:25 – 1122:13; 1179:5 – 1180:19; 1324:4-24, Def., Exhs. 38,
39.  In fact, the laxity and cavalier indifference with which Longo caused his expense
reimbursements to be handled produced mistakes which were demonstrated, even by
sample, to have caused at least several thousands of dollars of Company money to
disappear without explanation, resulting in overpayments to him.  Tr. 1134:15 – 1140:12,
Def. Exh. 111C.  The absence of control was so brazenly flagrant that Gianfranco
DiMeglio could dismiss it flippantly and contemptuously:

> Q.  So nobody is looking at this invoice before it is paid?
> A.  Correct.
> Q.  And as controller of the company, do you think that's controlling the
>      expenses of the company?
> A.  Do you really want me to answer that?
> Q.  It is not controlling the expenses of the company.
> A.  OK, so then you already know the answer.
> Q.  That is the answer, right, Mr. DiMeglio?
> A.  Yes.

Tr. 817:16-25.

There were other improprieties as well.  Among the items Fantappie asked to be
explained were what turned out to be improper gifts to public officials,[17] to employees
and to parent company officials – at a 10% surcharge.  Tr. 648:10 – 649:1; 1191:3 –
1193:22; 1207:7 – 1208:18; 1414:20 – 1416:9.[18]

---

[17]  Longo tried to dodge the impropriety of his munificent gift to the San Francisco official by casting doubt
that the official was in office at the time.  This was to no avail.  Longo admitted that it occurred when the
official, obviously current, had just bought a new home.  Tr. 339:10-21.  And even if the official had been
former at the time, which Longo's testimony clearly indicates he was not, what possible legitimate business
purpose was there in proffering an inducement to someone who was in no position to act upon it?
[18]  The entire "audit" charade put on by Longo was a red herring and a canard, with no relevant bearing
upon the issues here.  First of all, by his contract and by the applicable burden of proof here, it was *Longo's*
obligation to demonstrate – *contemporaneously* according to his contract and U.S. law, that his claimed
reimbursements were "documented and reasonable."  Tr. 1116:7-13; 1195:25 – 1196:6; Pl. Exh. 106, ¶ 3.

All of this showed the clear rationality of Fantappie's conclusion that "Mr. Longo showed poor judgment in using the company's money." Tr. 1416:6-9; 1557:15-19.

### 3.   Legal cause excused further performance by BTI.

The same facts here demonstrating insubordination, willful lack of cooperation and improper conduct satisfying the contractual termination clauses also constitute legal cause supporting termination of employment even in a contact for a definite term. See Williston on Contracts, § 54:13 (4th ed. 2006). Such facts constitute a material breach by the employee, which excuses the employer from any further performance under the contract.[19]

---

He did not do that—ever. Tr. 654:16 – 655:2. It was not BTI's burden to demonstrate the contrary. In this light, Longo's argument was only that he should be absolved for what he was able to get away with. Second, Iunco, upon whom Longo relies for absolution, was not an American accountant and did not review BTI under American standards or law. Tr. 385:5-15. He kept no record of the expense reports he says he reviewed. Tr. 393:9-14. He has no recollection of ever having seen the $10,061.50 check. Tr. 378:11-17. His primary purpose was to see that expenses were properly allocated to the customer contracts they related to. Tr. 395:1-10. The contention that BTI's external auditors had "access" to Longo's expense reports is gratuitous. There was uncontradicted knowledgeable testimony that such audits are focused at a much more general level, evaluating BTI's financial statements as a whole. Tr. 1198:11-21; 1363:11 – 1365:19. There was simply no competent evidence presented about what the outside auditors did or did not do or find, and it was not BTI's burden to present it. There is no reason why, if there was evidence the auditors had sprinkled holy water on Longo's expenses, Longo could not have taken third-party discovery to bring it before the Court. By his contract and the applicable I.R.S. rules, it was his obligation to justify his expenses *contemporaneously*, not BTI's to prove the contrary. Tr. 1116:2-13; 1195:25 – 1196:6; Pl. Exh. 106 ¶ 3. The same thing applies to the $10,061.50 check. Longo now says it was repaid. Tr. 351:2-3. That is not the answer he gave when he was deposed, by which time he had had a year to think about it. Tr. 670:5-25. In fact, he had not even bothered to look for the belatedly discovered check from him for the same amount at the time he was asked for an explanation. *Id.* At *that* time, which is the only time that matters in relation to Fantappie's termination decision, he simply had no explanation and did not seem to care to. Tr. 666:24 – 670:25. Indeed, Longo's attempt to parry the request by demanding that Fantappie produce documentation was bogus. The copy of the BTI check was found without any supporting documentation. Tr. 1328:4 – 1330:2. That was the point. And it was Longo's obligation, by the terms of his own contract, to justify it. Pl. Exh. 106 ¶ 3. Moreover, as to Iunco's review, it is impossible to see how DiMeglio could have been complying with the requirement to post Longo's expenses to the relevant account. DiMeglio admitted he never opened the envelopes, that Longo knew that, and that the envelopes on their exterior did not reveal the purpose of the expenditures. Tr. 813:13 – 816:14. Indeed, an examination of the single June 1999 report reveals $24,000 of expenses from all over the country and Canada. Def. Exh. 90. The inescapable inference is that Mr. DiMeglio's compliance with the policy Iunco enunciated in his 1995 report was so punctilious that he was simply picking contracts for allocation out of a hat.

[19] *See Rudman v. Cowles Communications, Inc.*, 35 A.D. 213, 215, 315 N.Y.S.2d 409, 411 (1st Dep't 1970), *mod. on other grounds* 30 N.Y.2d 1, 330 N.Y.2d 33 (1972) ("disobedience is a breach of duty, and like other breaches, entitles the employer to rescind the employment contract. The opinionated insistence

Moreover, the facts constituting cause need not be known at the time of the
termination of employment; it is sufficient if grounds are discovered later which would
justify termination for cause. *Getty v. Roger Williams Silver Co.*, 221 N.Y. 34, 39, 116
N.E. 381, 382 (1917). Also, the motive of the employer is irrelevant if the facts
constituting cause exist. *Id; Kilian v. The Ferrous Magnetic Corp.*, 245 A.D. 298, 280
N.Y.S. 909, 909 (1st Dep't 1935); *Heyman,, supra*, 344 F. Supp. at 1101.

## C.   No rational jury could find that BTI breached Longo's contract.

Even assuming the grounds for termination listed in Longo's contract had to be
satisfied, there was no substantial evidence that they were not. Based upon the
undisputed and uncontradicted evidence reviewed above, no rational jury could find that
BTI's dissatisfaction with Longo was unreasonable or unjustified, or that it was not
genuine. The termination reasons cited in summary by Fantappie, resistance to change to
accommodate the expanded role of BTI, rudeness, questionable judgment in expense
submissions and other business issues, and hindrance to efforts to change the operations

---

upon doing things in his own way, rather than as the employer reasonably directs, is not the employee's
prerogative."); *Shenk v. Red Sage, Inc.*, 1994 U.S. Dist. LEXIS 399, **45-46 (S.D.N.Y. Jan 21, 1994)
(insubordination operates to relieve the employer of its contractual obligations to the employee as a matter
of law; thus, employee failed to state claim for breach of contract where he derided a command as
"ridiculous," shouted "I'm not going to do it," and stalked off in anger); *Heyman v. Kline*, 344 F. Supp.
1088, 1101 (D. Conn. 1970), *rev. on other grounds*, 456 F.2d 123 (2d Cir. 1972) (employer not liable
despite employment contract for definite term where it fired employee for refusing to follow instructions,
carry out assignments as directed, or answer inquiries); *LaDuke v. Int'l Paper Co.*, 258 A.D. 375, 377, 17
N.Y.S.2d 608, 610 (3d Dep't 1940) (employer selects employee to do his work in the manner he directs and
may discharge the latter if the work is not done as directed); *Jerome v. Queen City Cycle Co.*, 163 N.Y.
351, 57 N.E. 485 (1900) (employer not liable for discharging employee before term of contract expired
based on disobedience of orders); *Speiden v. Innis*, 216 A.D. 408, 215 N.Y.S. 515 (1st Dep't 1926)
(discharge of employee before expiration of term of employment justified where employee was a
"disturbing element" who wrote insubordinate letters and refused and neglected to follow orders); *William
Stevens, Inc. v. Kings Village Corp.*, 234 A.D.2d 287, 650 N.Y.S.2d 307 (2d Dep't 1996) (discharge of
agent justified despite contract where agent failed to comply with direction of owner); *Graham v.
Texasgulf, Inc.*, 662 F. Supp. 1451, 1462-63 (D. Conn. 1987), aff'd 842 F.2d 1287 (2d Cir. 1988) (employer
excused from remainder of alleged employment contract where employee failed to follow reasonable
instructions, began communicating her disgruntlement to her superiors by way of memo rather than face to
face as was customary, and severed ties with her colleagues, applying Connecticut law); *MDO Dev. Corp.*

of the Company, were all borne out in the uncontradicted evidence.  See Pl. Exh. 107.

There was more than ample demonstration there that Longo, for arbitrary, groundless and

self-interested reasons, resisted and opposed organizational and operational changes

proposed to the Board; that he refused to accept or perform responsibilities assigned to

him by the Board and by Fantappie; that he adopted a contentious and subversive agenda

in opposition to Fantappie's management and issued hostile and threatening private

communications to him; that he attempted to exclude Fantappie entirely from marketing;

and that he exercised poor judgment in managing the Company's money.  Indeed, these

facts were enough to demonstrate legal cause to avoid the contract regardless of its terms.

As a result, there was no basis for any award of damages.

### III.    CONCLUSION.

For the foregoing reasons, JMOL in favor of BTI should be granted.

Dated:  March 7, 2007.

Alan A. D'Ambrosio  (AAD-1488)
John D. Giansello  (JG-0129)
Oswald B. Cousins  (OC-0048)
ORRICK, HERRINGTON & SUTCLIFFE  LLP
666 Fifth Avenue
New York, New York  10103
Telephone:  (212) 506-5000

By
John D. Giansello  (JG-0129)

Attorneys for Defendant
Breda Transportation, Inc.

---

*v. Kelly,* 735 F. Supp. 591, 593 (S.D.N.Y. 1990) (disloyal employee breached his contract of employment
and relieved employer of legal obligation under the contract).